IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RONDRICK GRANT #50153 | § | |
| v. | § | CIVIL ACTION NO. 6:22cv207 |
| UNKNOWN WATSON, et al.. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff Rondrick Grant, an inmate of the Gregg County Jail proceeding *pro se*, filed this lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights during his arrest. The remaining Defendants are Longview, Texas police officers Caleb Watson and Eric Wilson. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I. The Plaintiff's Amended Complaint**

The operative complaint is Plaintiff's Amended Complaint filed June 27, 2022. (Dkt. #8.) In it, he asserts the following facts, which are repeated here in their entirety:

> On April 30, 2022, I was walking down the access road between La Quinta and Red Roof Inn in Longview, Texas. I heard an engine roar and ran. I ran to the old NEWS Building. Police Officers Watson and Wilson arrested me and drug me through the building. I was taken to Gregg County Jail. I learned later Officer Watson almost ran me over and drug me through the old News Building. I learned Officer Wilson was the one who cuffed me. The cuffs were cutting through my palm from the time they were placed on me until placed into jail. While being dragged, the gash on my head opened and spewed blood. As a result of the harsh treatment, I take PTSD medicine. I could barely breath [sic] while in the police car.

(Dkt. #8 at 4.) When prompted to state with specificity what Defendant Watson did, Plaintiff alleges that Watson "attempted to run me over, drug me through building by my feet while cuffed." (*Id.* at

1

3.) With regard to Defendant Wilson, Plaintiff alleges he "placed cuffs on so tight they pierced my palm causing great pain." (*Id.*)

Plaintiff seeks unspecified money damages for pain and suffering and medical expenses. (*Id.* at 4.)

**II. The Motion for Summary Judgment**

In their motion for summary judgment, the Defendants assert that Plaintiff's claims fail as a matter of law because the evidence demonstrates that no excessive force was used on him during his arrest, and that no constitutional violation would be established even if Plaintiff had sustained an injury from being handcuffed too tightly. In support of these arguments, they rely heavily on their summary of the facts described below.

Alternatively, Defendants assert that they are entitled to qualified immunity from this suit because any violation that could be found on these facts was not clearly established at the time of Plaintiff's arrest.

Defendants ask that summary judgment be entered in their favor on the entirety of Plaintiff's suit.

Plaintiff was served with a copy of Defendants' motion for summary judgment and documentary exhibits. He was also given an opportunity to view Defendants' video exhibits, comprising the body camera videos from all six officers involved in his arrest (discussed below). Defendants have submitted the affidavit of private investigator Jerry Cobb, who visited Plaintiff in jail on their behalf on March 21, 2023. (Dkt. #36-8.) He played two of the videos for Plaintiff on a portable computer, and began to play a third, but Plaintiff asked to stop the video and declined to watch the rest of the videos. (*Id.*) Plaintiff has not responded to Defendants' motion.

### III. The Summary Judgment Evidence

The Defendants attach as summary judgment evidence affidavits from Defendants Watson and Wilson, as well as Officers Cody Lusk, Raymond Lim, Edward Buckner, and Tristan Sloan, and jail nurse Kevin Burchfield. The Defendants also submit the bodycam videos of all six officers. The combined content of this evidence establishes the following summary of events surrounding Plaintiff's arrest.

At approximately 6:45 p.m. on April 30, 2022, Defendant Watson was on duty and driving on a routine patrol in Longview, Texas, when he saw and recognized Plaintiff walking down the road and knew that there was an active warrant for Plaintiff's arrest. (Dkt. #36-1 at 1.) Watson called Wilson, who was in the area, to assist in arresting Plaintiff. (Dkt. #36-1 at 1.) Wilson arrived and confirmed Plaintiff's identity, and the two officers proceeded to try to stop Plaintiff by pulling their vehicles behind and in front of him. (Dkt. #36-1 at 1; Dkt. #36-2 at 1.) As soon as Wilson pulled in front of Plaintiff and activated the lights on his police car, Plaintiff started running through private property. (Dkt. #36-1 at 1; Dkt. #36-2 at 1.) Watson said "oh yeah, it's on" and proceeded to park his car and get out to chase Plaintiff on foot. (Exhibit A1 at 00:03–00:13.)

For more than a minute, Wilson and Watson ran in pursuit of Plaintiff, with Wilson in the lead. Watson yelled "Stop! Police!," but the pursuit continued. (Exhibit A1 at 00:20.) The chase proceeded through vegetation, around a fence, past a hotel, and around a building with a "For Sale" sign, which Watson identifies on his radio as "the old TV station on North Access." (Exhibit A1 at 01:05.) Ultimately, Wilson rounded a corner before Watson and pointed to a broken window in the back of the building, saying "he went in there." (Exhibit A1 at 01:20.) Wilson had to stop to tie his shoe, and Watson took the lead. (Exhibit B1 at 01:27.) As Watson approached the window, he radioed to request a unit to the front of the TV station to "build up a perimeter." (Exhibit A1 at 1:32.)

3

When he reached the window, Watson's body cam recorded that his weapon was drawn. (Exhibit A1 at 01:47.) After reassurance from Wilson that he had seen Plaintiff enter the building through the window, Watson climbed through the window. (Exhibit A1 at 02:07.) He entered into a small room that opened to a dark hallway, and the floor throughout was covered with plywood and debris. Watson proceeded into the hallway, immediately saw Plaintiff and ordered him to let Watson see his hands and to get down on the ground on his stomach. (Exhibit A1 at 02:17–02:30.) Watson saw Plaintiff's arm move behind a door and later found a bag containing methamphetamine within five feet of where Plaintiff was detained. (Dkt. #36-1 at 2.) Plaintiff complied with the order to get on the ground, and Wilson, who had followed Watson through the window and into the hallway, bent over to handcuff him behind his back. (Exhibit A1 at 02:31; Exhibit B1 at 02:35; Dkt. #36-2 at 2.) Although Wilson did not mention the injury at that time (Dkt. #36-2 at 2), the heel of Plaintiff's right hand was already visibly cut and bleeding as Wilson placed the cuff around his wrists. (Exhibit B1 at 02:38–02:39.) This image of the injury at that time has been extracted from Wilson's body cam video:



Wilson has testified that the cuffs were not too tight and were double-locked to prevent them from tightening. (Dkt. #36-2 at 2.)

At approximately 6:48 p.m., Wilson rolled Plaintiff onto his left side, informed Plaintiff that he was under arrest, began searching him and pulled something out of his right shorts pocket. (Exhibit A1 at 02:51; Exhibit B2 at 02:53.) (He later showed Lusk a broken pipe he found on Plaintiff. (Exhibit D1 at 09:56.)) Wilson then put on gloves and continued to search Plaintiff. (Exhibit A1 at 03:28; Exhibit B2 at 03:22.) As Watson radioed that he had a suspect in custody and asked for a patrol unit to come to the back of the building, he pointed Wilson to "some meth right here." (Exhibit A1 at 03:42.)

Wilson began attempting to get Plaintiff to sit up by telling him to roll onto his left side and pull his knees up to his chest. (Exhibit A1 at 04:10; Exhibit B1 at 04:21.) Plaintiff argued with Wilson and was uncooperative. (Exhibit A1 at 04:23.) He complained of an ankle injury and said "I didn't just do it, it been like this." (Exhibit A1 at 04:41; Exhibit B1 at 04:47.) Watson said it was not hurting when Plaintiff was running from them, and Plaintiff responded "adrenaline, home boy." (Exhibit A1 at 04:46; Exhibit B1 at 04:54.) Wilson tried to get Plaintiff to his feet by lifting him by his underarms, but Plaintiff continued to resist and complain about his ankle. (Exhibit A1 at 05:35; Exhibit B1 at 05:42.) Plaintiff screamed for Wilson to stop, and Wilson placed Plaintiff back on the ground and proceeded to check Plaintiff's ankle for injury. (Exhibit A1 at 05:45; Exhibit B1 at 05:54.) Plaintiff's shoes and socks were removed in this process. Wilson said Plaintiff's ankle might be "swollen a little bit" and asked if Plaintiff could hop on his left foot. (Exhibit A1 at 06:16; Exhibit B1 at 06:20.) Plaintiff continued to say that he was going to get up, but he never voluntarily stood up. (Exhibit A1 at 06:20.)

At approximately 6:52 p.m., Watson returned to the broken window for better radio

communication. (Exhibit A1 at 06:20.) Wilson said to Plaintiff "you're gonna hop on your left foot, come on." (Exhibit B1 at 07:05.) Plaintiff said he was "fixin' to have a heart attack," and Wilson responded that they had to get him out of the building and there was no way out other than the way he came in. (Exhibit B1 at 07:08.)

Meanwhile, Watson radioed that they had Rondrick Grant in custody, that he was refusing to exit the building, and they might need another unit to help get him out. (Exhibit A1 at 06:45.) Officers Buckner, Lim, Sloan, and Lusk ultimately responded to the scene. (Dkt. #36-3 at 1.) Officer Buckner arrived at the window while Watson was still there, and he followed Watson back to where Plaintiff was lying in the floor and Wilson was still trying to coax him into standing up by saying that an ambulance could not get to him in the building. (Exhibit A1 at 07:10; Exhibit B1 at 07:15.) Plaintiff was "uncooperative." (Dkt. #36-3 at 1; Dkt. #36-5 at 1.) Watson told Plaintiff that he was either going to get up and walk outside or they were going to carry him, and Plaintiff remained in the floor saying "y'all gonna kill me." (Exhibit A1 at 07:12; Exhibit B1 at 07:22.) At approximately 6:53 p.m., Watson said they would carry Plaintiff out. (Exhibit A1 at 07:20.) The officers proceeded to try to lift Plaintiff from the floor as he resisted and yelled "don't . . . please don't kill me" and complained of his chest being "squeezed." (Exhibit A1 at 07:25.) With Plaintiff yelling about wanting to be put down, cursing, and complaining that he could not breathe, the officers lifted and moved him back into the room with the broken window and put him down on the floor. (Exhibit A1 at 07:38–07:50; Exhibit B1 at 07:44–07:57.) The video footage shows that Plaintiff was being lifted by his arms and that his head was upright as he was being moved. (Exhibit A1 at 07:38–07:50; Exhibit C1 at 00:26.)

Although Officer Buckner's camera did not capture what Plaintiff was doing as he lay in the floor, Buckner said "hey Rondrick, man, you ain't coming out of cuffs, okay? Just you're makin' it harder on yourself." (Exhibit C1 at 00:50.) Plaintiff lay in the floor saying "wait" and refusing to get

up, despite Officer Buckner's entreaty to "stand up and walk out like a man." (Exhibit A1 at 08:16.) Officer Wilson began trying to clear a path to the window, moving a long wooden pole to the side, which seemed to tip over two square metal screens that had been leaning against the wall. (Exhibit B1 at 08:36–08:50; Exhibit C1 at 01:16.) The videos do not capture where these items landed as they tipped over, other than the metallic sound of their clinking onto the floor. Still lying in the floor, Plaintiff immediately began to complain obscenely about his toe being hurt. (Exhibit A1 at 08:45; Exhibit B1 at 08:50; Exhibit C1 at 01:30.)

Officer Lim discovered and informed the group that the front door to the building was open (Exhibit F1 at 00:37; Dkt. #36-6 at 2), so several officers, including Buckner and Lim picked Plaintiff up and began to carry him toward the exit as he screamed "wait" and "stop" and generally continued his profanity. (Exhibit A1 at 08:56; Exhibit C1 at 01:44; Exhibit F1 at 01:07.) Plaintiff protested until one of the officers asked if he wanted to walk and instructed the others to "set his feet down." (Exhibit A1 at 09:05; Exhibit C1 at 01:53.) But once Plaintiff's feet were on the floor and he was being held upright and maneuvered forward by officers holding him by the arm, he complained about the officers' holding his arms, insisting that he was "gonna walk," but refusing to actually do so. (Exhibit A1 at 09:13; Exhibit B1 at 09:18.) After pausing briefly and still getting no cooperation from Plaintiff, the officers holding Plaintiff's arms briefly forced him forward at a quicker pace. (Exhibit B1 at 09:38–09:45.) Officer Lusk arrived in the hallway at this point, along with Officer Sloan, and observed the rest of Plaintiff's removal from the building, including Plaintiff's continued non-cooperation and attempt to drop to the floor. (Exhibit D1 at 00:44; Exhibit E1 at 00:46.) As they reached a turn toward the exit, Officer Lim, who was leading the way through the darkened building with his flashlight, said they needed to lift Plaintiff up because of glass in the floor (Exhibit F1 at 01:44), and Lusk lifted one leg while Lim lifted the other to carry him the rest of the way out of the

7

building. (Exhibit B1 at 09:45; Exhibit C1 at 02:23; Exhibit D1 at 01:08; Exhibit F1 at 02:01.) The group proceeded toward the exit, carrying Plaintiff by his arms and legs as he screamed and repeated that he could not breathe. At approximately 6:55 p.m., Plaintiff was carried out two sets of glass doors feet-first and placed on the ground outside the building. (Exhibit A1 at 10:14; Exhibit C1 at 02:56; Exhibit D1 at 01:25; Exhibit E1 at 01:22; Exhibit F1 at 02:14.) As soon as he was on the ground, Plaintiff began to complain that someone had "bust[ed]" his head. (Exhibit A1 at 10:17; Exhibit C1 at 03:03; Exhibit D1 at 01:30.)

At no time did any of the officers on the scene see Plaintiff's head hit anything or see anything happen that would have injured his hand. (Dkt. #36-1 at 2; Dkt. #36-2 at 2; Dkt. #36-3 at 2; Dkt. #36-4 at 2; Dkt. #36-5 at 2; Dkt. #36-6 at 2.) No one struck Plaintiff, and each officer has testified that the force used on Plaintiff was limited to what was necessary to carry him from the building. (Dkt. #36-1 at 2; Dkt. #36-2 at 2; Dkt. #36-3 at 2; Dkt. #36-4 at 2; Dkt. #36-5 at 2; Dkt. #36-6 at 2.) Some of them speculate that Plaintiff may have cut his hand on broken glass as he climbed through the window of the building or earlier when he ran through thorny vegetation during the foot chase. (Dkt. #36-1 at 2; Dkt. #36-2 at 2.) Officer Wilson himself sustained a cut to his face near his left eye from a thorn during the chase, which was bleeding as the officers stood talking outside the building. (Dkt. #36-2 at 2; Exhibit A1 at 16:54; Exhibit B1 at 10:38; Exhibit B1 at 16:49.)

Plaintiff lay on the ground for several minutes with nobody touching him, repeating "no, no, you bust my head . . . you hit my toe, I gotcha now . . . I got y'all." (Exhibit A1 at 10:59; Exhibit B1 at 11:20; Exhibit C1 at 03:46.) He moaned, talked, and shouted obscenities until approximately 6:59 p.m. when the officers began trying to get him up to move him to the back of a police car. (Exhibit A1 at 13:33; Exhibit B1 at 13:45.) Plaintiff was moved into a sitting position and, with Officer Wilson holding his right arm and Officer Lusk holding his left arm, he was lifted to his feet as he protested

and said "all y'all goin' down." (Exhibit A1 at 14:13; Exhibit B1 at 14:19; Exhibit C1 at 06:27; Exhibit D1 at 04:51.) With Lusk and Wilson holding his arms, Plaintiff walked toward the vehicle but paused before getting in it, saying he wanted to talk to the officers first. (Exhibit B1 at 14:50.) He said Watson cut his toe and busted his head. (Exhibit B1 at 14:55; Exhibit D1 at 05:56.) He said there were "two places for me to go, jail or hell," and that he did not consider jail to be an option. (Exhibit B1 at 15:30; Exhibit C1 at 08:09; Exhibit D1 at 06:37.) He said the officers were "fi'n to kill" him because he was "fi'n to make [them] do it." (Exhibit B1 at 15:40; Exhibit D1 at 06:47.) Officer Lusk said "no, we're not gonna do that," but Plaintiff continued his combative, threatening speech, saying he was "gonna make y'all kill me, make y'all beat me to death." (Exhibit B1 at 15:47; Exhibit D1 at 06:49.) He repeatedly asked "y'all ready?" and said "I'm ready for all five y'all." (Exhibit B1 at 15:51; Exhibit D1 at 06:57.)

Officer Lusk tried to "look [plaintiff] over" for any injuries while standing outside the car, as Plaintiff protested. (Exhibit A1 at 15:06; Exhibit C1 at 07:50; Exhibit D1 at 05:54.) As Officers Wilson and Lusk placed Plaintiff in the back of Officer Buckner's police car, they noticed the cut on the heel of his hand. (Exhibit D1 at 07:24; Dkt. #36-2 at 2; Dkt. #36-3 at 2.) Wilson said it was "already like that," and Lusk said he probably got cut from "the glass or something" but probably needed to go to the hospital for clearance. (Exhibit B1 at 16:16; Exhibit D1 at 07:22.) This image, extracted from Lusk's body cam video, shows the injury as it appeared when Plaintiff was placed in the back of the car:



While seated in the back of the police car, Plaintiff refused to obey several commands to slide fully inside the vehicle so the door could be closed. (Exhibit A1 at 18:34; Exhibit C1 at 09:10.) He demanded an ambulance and said he wanted to sit on the ground until it came because "I know my rights, my constitution." (Exhibit B1 at 16:38; Exhibit C1 at 09:20.) He said he needed medical attention for "my head, my toe, and everywhere else I'm bleeding." (Exhibit C1 at 09:30; Exhibit D1 at 07:55.) Lusk told Plaintiff that an ambulance was coming to check on him and that they needed him to sit in the car to wait, but Plaintiff repeatedly responded "uh uh" and refused to move fully inside the car, saying he wanted to sit on the ground. (Exhibit D1 at 08:09.) He sat with his right leg outside the car muttering incoherently about not being able to breathe, his constitutional rights, and being hurt, saying "kill me, I'm ready," until he started sliding out of the car and yelled "I'm slippin' goddamnit." (Exhibit D1 at 08:42–09:17.) Lusk helped Plaintiff back onto the seat of the car and this time lifted his right leg into the car as well, with Plaintiff protesting "no, no, my constitutional right, bruh." (Exhibit D1 at 09:20.) As Lusk tried to close the door, Plaintiff stuck his leg back out of the

car and screamed, so Lusk pulled the door back open. (Exhibit D1 at 09:29.) Another officer then went to the other side of the car and pulled Plaintiff by the arm while Officer Watson used one hand to push Plaintiff's right knee into the car and close the door as Plaintiff yelled. (Exhibit A1 at 18:37.)

As several officers waited for emergency medical responders to arrive and check Plaintiff's condition, Officer Lusk checked on Plaintiff through the window of the police car and stated that Plaintiff was trying to make himself hyperventilate. (Exhibit C1 at 13:30; Exhibit D1 at 11:51.) Lusk opened the back door, revealing Plaintiff slumped over on his left side, and told him he needed to sit up. (Exhibit D1 at 12:10.) Plaintiff said "you pushed me over" and did not sit up. (Exhibit D1 at 12:16.) Officer Buckner rolled down the rear driver's side window and told Plaintiff he needed to sit up. (Exhibit C1 at 13:43.) Several minutes later, after repeatedly checking on Plaintiff's condition through the window, Buckner said it would "probably be easier to breathe if you'd sit up." (Exhibit C1 at 16:33.) Minutes later, Buckner again encouraged Plaintiff to sit up and asked him why he had lain down. (Exhibit C1 at 18:49.) Plaintiff then began complaining that he could not get up. (Exhibit C1 at 19:17.) Officer Buckner put on gloves to open the door and help Plaintiff sit up. (Exhibit C1 at 19:30.)

Emergency responders from the Longview Fire Department arrived at approximately 7:13 p.m., and Officer Buckner opened the back door of his police car for Plaintiff to be examined. (Exhibit C1 at 21:11.) Paramedic Taylor asked Plaintiff what was going on, and Plaintiff simply leaned over and did not respond. (Exhibit C1 at 21:24.) Officer Buckner explained that Plaintiff had run from police and said his toe hurt, but before the paramedic could check Plaintiff's toe, Plaintiff said he was going to throw up and needed to gag himself. (Exhibit C1 at 21:29.) Paramedic Horton told Plaintiff to just throw up if he needed to and said that if Plaintiff could not throw up without gagging himself then he did not need to. (Exhibit C1 at 22:35.) He asked Plaintiff "why are we here?" and Plaintiff

answered "'cause the man cut my toe." (Exhibit C1 at 22:42.) The first paramedic asked Plaintiff to swing his feet out of the vehicle to be checked, but Plaintiff remained hunched over and did not comply. (Exhibit C1 at 22:57.) He proceeded cursing at the paramedics and said something about an ambulance. (Exhibit C1 at 23:03.) He told them to "get the fuck up off me," called one of them Watson, and hurled another obscenity, to which Paramedic Horton responded that there was "nothing wrong with [Plaintiff's] fucking foot." (Exhibit C1 at 23:08.) At that point Officer Buckner said they would "just call it," and closed the car door with Plaintiff still inside, complaining and demanding to see a doctor. (Exhibit C1 at 23:12.) Officer Wilson asked Horton if Plaintiff needed stitches, and Horton said no, that there was just a small cut on top of his toe. (Exhibit C1 at 23:36.) Within a minute, Plaintiff vomited loudly in the back of Buckner's vehicle, followed by more vulgarity directed at the officers. (Exhibit C1 at 24:00.)

At 7:17 p.m., Officer Buckner proceeded to drive Plaintiff to the jail, where they arrived at 7:28. (Exhibit C1 at 25:24–35:51.) Plaintiff was again uncooperative and asking about an ambulance as Buckner tried to coax him out of the vehicle. (Exhibit C1 at 36:49.) Plaintiff barely moved one leg, saying he was trying to get out, and said "y'all hurt me." (Exhibit C1 at 37:06.) Still refusing to exit the car, he started complaining again that he was going to throw up. (Exhibit C1 at 37:40.) As Buckner patiently waited and tried to convince Plaintiff to get out of the car, Plaintiff finally (slowly) swung both legs out of the car and nodded his agreement to Buckner's offer to help him stand up. (Exhibit C1 at 39:30.) With Buckner holding his right arm, Plaintiff finally got out of the car at approximately 7:32. (Exhibit C1 at 39:42.) With Plaintiff complaining about his foot and the cut on his hand and saying he was going to throw up, the two slowly made their way into the jail and to the booking area where Plaintiff was seated on a bench and given a trash can in case he needed to vomit. (Exhibit C1 at 42:20.)

Registered nurse Kenneth Burchfield examined Plaintiff as he lay on the bench repeating "he beat me up." (Exhibit C1 at 47:46; Dkt. #36-7 at 1.) Burchfield observed Plaintiff being non-compliant and combative with the booking officers. (Dkt. #36-7 at 1.) Plaintiff told Burchfield that he was addicted to methamphetamine. (*Id.*) He also told Burchfield that his right hand was injured during his arrest. (*Id.*) Burchfield observed a "small wound" on Plaintiff's right hand, which did not require sutures. (*Id.*) Burchfield cleaned and bandaged the wound. (*Id.*) He did not observe any injury to Plaintiff's head, and Plaintiff did not require any further medical attention. (*Id.*) A Medical Activity Log dated April 30, 2022, attached to Burchfield's affidavit corroborates his testimony. (Dkt. #36-7 at 2.) Burchfield did not document any complaint or observation of any injury to Plaintiff's toe.

## IV. Discussion

### A. General Standards for Summary Judgment

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004). If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.* (citing *Allen v. Rapides Parish School Board*, 204 F.3d 619, 621 (5th Cir. 2000)).

The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. *Boudreaux v. Swift Transportation Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little*

*v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non- moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show a genuine factual issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Fifth Circuit has stated "we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011), *citing Scott v. Harris*, 550 U.S. 372, 381 (2007) (a court of appeals need not rely on the plaintiff's description of the facts where the record discredits such description but should instead consider "the facts in the light depicted by the videotape.")). Furthermore, Plaintiff did not file a response to the motion for summary judgment; accordingly, the district court may accept as undisputed the facts listed in support of Defendants' motion. *Eversley v. Mbank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988); *United States v. Dallas Area Rapid Transit*, 96 F.3d 1445, 1996 U.S. App. LEXIS 25217, 1996 WL 512288 (5th Cir., August 30, 1996).

The Court has set out the facts evident from all six of the videos of Plaintiff's arrest and has considered these facts as evident from the scene in reviewing Plaintiff's claims. Review of these videos show that they materially comport with the accounts given by the officers in their affidavits.

B. <u>General Standards for Uses of Force in Arrests</u>

The constitutional provision at issue is the Fourth Amendment, which provides a right to be free from excessive force during a seizure. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 322 (5th Cir. 2020), *citing Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). A violation of this right occurs when a seized person suffers an injury which results directly and only from a clearly excessive and objectively unreasonable use of force. *Id.*; *see also Windham v. Harris Cnty.*, 875 F.3d 229, 242 (5th Cir. 2017) ("To prevail on an excessive force claim, a plaintiff must show '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'"). Determining whether force was excessive or unreasonable is a necessarily fact-intensive and case-specific inquiry, and the test for reasonableness is not capable of precise definition or mechanical application. *Joseph*, 981 F.3d at 322.

The Supreme Court has outlined certain considerations that inform the need for force, including: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. These considerations are reviewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Conner*, 490 U.S. 386, 394 (1989).

These considerations also require an assessment of not only the need for force, but the relationship between the need and the amount of force used. The Fifth Circuit explained that while a suspect's refusal to comply with instructions may indicate that physical force is justified, the officers must also select the appropriate degree of force. *Joseph*, 981 F.3d at 332. The officers must use force "with measured and ascending actions that correspond to a suspect's escalating verbal and physical

15

resistance." *Id., citing Poole*, 691 F.3d at 629.  When a suspect is passively resisting, force may be less justified; the Fifth Circuit stated that "as to a passively resisting suspect, an officer does not take measured and ascending action by immediate resort to taser and nightstick without attempting to use physical skill, negotiation, or even commands."  *Id.*

The Fifth Circuit has explained the connection between the force used and the injury required to establish a Fourth Amendment violation:

> "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.'" *Brown v. Lynch*, 524 Fed. Appx. 69, 79 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996)). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (emphasis added) (footnote omitted). Consequently, "only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment." *Ikerd*, 101 F.3d at 434 n.9. In short, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown*, 524 Fed. Appx. at 79 (footnotes omitted) (quoting *Ikerd*, 101 F.3d at 434).

*Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

C. Application of the Standards to Plaintiff's Case

In the present case, the officers were confronted with a suspect who was already wanted for arrest, had attempted to evade arrest by flight, and was consistently refusing to comply with repeated orders to stand up and walk. This is not a situation in which Plaintiff ever actually began to comply and Defendants proceeded to use force anyway. *Cf Bagley v. Guillen*, No. 22-20644, 2024 WL 107888, at *4 (5th Cir. Jan. 10, 2024) (reversing finding of qualified immunity where plaintiff "was attempting to comply with [officer's] commands at the time he was tased"). The video evidence leaves no genuine dispute about the fact that Plaintiff consistently promised to comply but never voluntarily tried to exit the building. The evidence thus establishes beyond debate that it was necessary for the

16

officers to physically remove Plaintiff from the abandoned building in order to take him into custody. *See Graham*, 490 U.S. at 394; *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (noting that "officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance.") Moreover, in light of Plaintiff's bare feet and the broken glass and other debris on the floor, it was necessary to carry Plaintiff out of the building for his own safety.

As the Fifth Circuit explained, once some force is found to be appropriate, an officer must select the amount of force that is appropriate and not immediately resort to more severe measures, such as a taser or nightstick. *Joseph*, 981 F.3d at 333. The video evidence in this case establishes beyond reasonable debate that no force at all was used on Plaintiff beyond what was necessary to remove him from the building and place him in the police car. There is no genuine issue concerning whether this type of force was constitutional in the circumstances the officers faced. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." (Internal punctuation and citation omitted)); *Lockett v. Donnellon*, 38 F. App'x 289, 292 (6th Cir. 2002) (affirming summary judgment for defendants because although officers "pushed and pulled [plaintiff] into the car in a rough manner, such force was necessitated by [plaintiff's] resistance and cannot be deemed excessive as a matter of law").

Although Plaintiff contends that the officers dragged him and caused a "gash" on his head to "spew blood," the video evidence does not bear this out. At all times when Plaintiff's head is visible on the video, it is off the ground and between two officers who are carrying him or trying to help him to walk. No injury is visible on his head at any point in the video—not in the building, on the ground outside the building, in the back of the police car, or in the jail—and neither the paramedics who

attended him on the scene or the nurse who examined him in the jail saw any head injury. And finally, even if Plaintiff's head inadvertently bumped against something on the way out of the building without being captured on video, that inconsequential accident would not support an excessive force claim. *See Gorman v. Sharp*, 892 F.3d 172, 173 (5th Cir. 2018) ("[T]here is no Fourth Amendment violation in the absence of intentional conduct."); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 642 (5th Cir. 1996) (citing case law to the effect that "negligence on the part of the arresting officer . . . fails to state a claim" under the Constitution (citation omitted)). On the evidence in this case, Plaintiff's claim of a head injury caused by excessive force is both factually false and legally frivolous.

Plaintiff's claim that the handcuffs were applied so tightly that they cut his hand is also refuted beyond debate by the summary judgment evidence. There is no genuine dispute that the heel of Plaintiff's hand was already cut at the time Wilson placed the handcuffs around his wrists. There are several possible explanations for the cut supported by the evidence: the thorny bushes through which he fled, the broken glass around the window through which he entered the building, or the broken pipe found in his pocket. The audio of Officer Buckner's body cam footage also indicates that Plaintiff may have exacerbated the cut or at least wriggled the right cuff down to the heel of his hand by struggling against the cuffs as he lay on the floor in the building. But Defendants are not required to prove how Plaintiff's hand was cut to prevail on their motion. The evidence clearly establishes that it was not caused by any action on their part.

Moreover, as Defendants correctly argue, even if the handcuffs had caused Plaintiff's injury, that would not constitute excessive force by Defendants. The Fifth Circuit has said that it is "clearly established" in this circuit that "[t]ight handcuffing alone, even where a detainee sustains minor injuries, does not present an excessive force claim." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th

18

Cir. 2022). The unrefuted summary judgment evidence establishes that the cut on Plaintiff's hand required nothing more than cleaning and a bandage. Accordingly, it could not, as a matter of law, support a claim of excessive force.

Plaintiff's allegations of difficulty breathing in the police car and later requiring medication for P.T.S.D. also fail to establish any constitutional violation on the record in this case. On video, Plaintiff bragged about being a 46-year-old man who could have outrun the police "with one more breath of wind, bitch" (Exhibit D1 at 05:38), and he also expended a significant amount of breath and energy throughout the incident by yelling, cursing, and threatening the officers. Whatever difficulty Plaintiff had breathing was not caused by any force used by Defendants, and the same is obviously true for his vomiting. Nor is there any evidence from which a fact-finder could conclude that the force Defendants used to lift and carry Plaintiff out of the building and to the police car could have traumatized Plaintiff. Although psychological injury can satisfy the injury requirement of a constitutional claim, *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005), the injury must be proved to be the direct result of the defendants' unreasonable behavior. The record in this case disproves any connection between Defendants' behavior and Plaintiff's alleged trauma. Faced with a belligerent, verbally abusive, and uncooperative arrestee, all of the officers involved were calm, composed, and peaceful in their dealings with Plaintiff. Any claim that Defendants' behavior was excessively forceful, violent, or threatening enough to plausibly traumatize Plaintiff is frivolous.

With regard to Plaintiff's conclusory allegation that Defendant Watson "attempted to run [him] over," both Watson and Wilson have testified by affidavit that their goal was to stop Plaintiff by approaching him in their police cars and that Plaintiff took off running as soon as Wilson drove passed him with his overhead lights on. Plaintiff has not refuted that evidence, and his pleading does not offer any facts or plausible theory to support his claim that Watson tried to run over him. There

is no genuine issue of material fact concerning this unsupported allegation.

To the extent that a liberal construction of the record in Plaintiff's favor requires the Court to consider whether his complaints about a toe or ankle injury, captured on several officers' body cam footage, could establish a violation of his constitutional rights, they do not. At the time Plaintiff mentioned an ankle injury as an excuse for not standing up and walking, he insisted that it was a pre-existing injury and explained that he had only been able to run from the officers because of adrenaline. Accordingly, no reasonable fact-finder could attribute that injury to Defendants. And Plaintiff did not mention a toe injury until the screens were tipped over in his vicinity as he lay on the floor refusing to exit the building. Viewing that evidence in the light most favorable to Plaintiff, it is possible that Officer Wilson's efforts to clear debris away from the immediate area accidentally caused the screens to fall and hurt Plaintiff's toe. But again, accidents do not violate the Constitution. *Gorman*, 892 F.3d at 173. Moreover, Plaintiff does not allege a toe injury in his sworn amended complaint, and any injury to Plaintiff's toe was obviously negligible, as evidenced by Paramedic Horton's comment at the scene, Plaintiff's failure to mention a toe injury to the jail nurse, and the nurse's affidavit and contemporaneous medical log, which documented the cut on Plaintiff's hand as his only injury. And Plaintiff does not allege—and the summary judgment evidence refutes—any force used so maliciously or unreasonably that such a *de minimis* injury could establish a constitutional violation. *Cf. Schmidt v. Gray*, 399 F. App'x 925, 928 (5th Cir. 2010) ("We have recognized, however, that even insignificant injuries may 'qualify as a cognizable injury when the victim is maliciously assaulted by a police officer.'").

From the record in this case, no reasonable fact-finder could find that Defendants used any force that was objectively unreasonable or excessive to the need posed by Plaintiff's refusal to exit the building. Nor could any reasonable fact-finder find that Plaintiff suffered any cognizable injury

as a direct result of the reasonable force employed by the officers. There is thus no genuine issue of material fact remaining to be decided in this case, and Defendants are entitled to summary judgment on Plaintiff's claims against them.

### D. Qualified Immunity

The Defendants have also invoked the defense of qualified immunity in their motion for summary judgment. It is thus Plaintiff's burden to show that qualified immunity does not apply in this case. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020). Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 643-44 (5th Cir. 2014).

To overcome qualified immunity, a plaintiff must show both that the government official violated a constitutional right and that the right was clearly established at the time of the challenged conduct. *Laviage v. Fite*, 47 F.3d 402, 405 (5th Cir. 2022). The Fifth Circuit has explained the law of qualified immunity as follows:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It protects 'all but the plainly incompetent or those who knowingly violate the law.' *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
>
> Our qualified immunity inquiry is two-pronged. *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was 'clearly established.' *Id.* We can analyze the prongs in either order or resolve the case on a single prong. *Id.*

*Cunningham v. Castloo*, 983 F.3d 185, 190–91 (5th Cir. 2020).

The second prong of the analysis is "difficult to satisfy," as the Fifth Circuit went on to explain:

> A right is "clearly established" only if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix*, 577 U.S. at 11. We must define the right "with specificity." *City of Escondido v. Emmons*, – U.S. –, 139 S. Ct. 500, 503 (2019) (per curiam) (citation and quotation marks omitted). A case "directly on point" is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, "there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citation omitted). This rule is a "demanding standard," *Dist. of Columbia v. Wesby*, – U.S. –, 138 S. Ct. 577, 589 (2018) (citation omitted), and the Supreme Court "repeatedly" has told us "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Ultimately, "[t]he dispositive question is whether the violative nature

of the particular conduct is clearly established." *Mullenix*, 577 U.S. at 12 (citation omitted). We undertake that inquiry "'in [the] light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

*Id.* at 191. Simply stated, "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [defendants] did here, or *every* reasonable officer faced with the same facts would *not* have" taken the actions Defendants took. *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019).

The Court finds above that no reasonable fact-finder could conclude from the evidence in this case that Defendants violated Plaintiff's constitutional rights in this case, so Defendants prevail on the first prong of the qualified immunity defense. But even if a violation could be found on the facts in the record, it was not clearly established in the existing law.

As Defendants assert, there is no controlling precedent establishing that police officers violate the constitution by picking up an uncooperative arrestee and carrying him. Reasonable officers in Defendants' position, knowing that Plaintiff had fled into a building in an attempt to evade arrest and was refusing to exit despite multiple orders and ample opportunity to do so, would believe that lifting him and carrying him out against his will was a reasonable and necessary step to complete his detention. Because the force used is measured against the facts as a reasonable officer would perceive them, and the summary judgment evidence shows that it was reasonable for the officers to use the force necessary to remove Plaintiff from the building and place him in a police car, the officers' actions were objectively reasonable and did not violate any clearly established right of which a reasonable officer would have known. Defendants are entitled to qualified immunity, and their motion for summary judgment should be granted.

## RECOMMENDATION

The undersigned accordingly recommends that Defendants' motion for summary judgment be granted and the claims against these Defendants dismissed with prejudice. Because these are the

last remaining claims in the lawsuit, it is further recommended that final judgment be entered in the case.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

So ORDERED and SIGNED this 30th day of January, 2024.

K. Nicole Mitchell

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE